# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | CAUSE NO.: 1:11-CR-78-TLS | |
| | ) | | |
| SHAFT JONES | ) | | |

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion to Suppress [ECF No. 24],
filed on June 7, 2012. The Fourth Amendment issues raised by the Defendant's Motion are
whether agents of the Drug Enforcement Administration (DEA) and the Fort Wayne Police
Department (FWPD) had probable cause to arrest the Defendant on December 7, 2011, and
whether the searches of his vehicle, person, and home were therefore proper.[1] Because the Court
concludes that the DEA and FWPD officers did have probable cause to arrest the Defendant on
December 7, 2011, the Court will deny the Motion to Suppress.

## BACKGROUND

On December 9, 2011, the Government filed a Criminal Complaint [ECF No. 1] alleging
that the Defendant, Shaft Jones, conspired to possess with the intent to distribute five kilograms
or more of cocaine, in violation of 21 U.S.C. § 846; attempted to possess with the intent to
distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; and carried a
firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). An
affidavit by DEA Special Agent Howard Schneider accompanied the Criminal Complaint. On

---

[1]The Defendant argues that because there was no probable cause to arrest him on December 7, the
subsequent searches of his vehicle, person, and home were therefore improper. The Defendant offers no
other basis to invalidate these searches other than the argument relating to his arrest.

December 22, the Government filed an Indictment [ECF No. 13] charging the Defendant with the same three crimes alleged in the Criminal Complaint. The Magistrate Judge arraigned the Defendant on December 27, and the Defendant entered a plea of not guilty to all counts. On June 7, 2012, the Defendant filed his Motion to Suppress [ECF No. 24], in which he argued that probable cause did not exist to arrest him on December 7, 2011, and that the evidence found in his vehicle, found on his person, and later found in his home should therefore be suppressed. On June 15, the Government filed an initial Response [ECF No. 27] to the Motion to Suppress, arguing that the agents possessed reliable information from a confidential source which, along with the agents' expertise in evaluating the Defendant's conduct, provided probable cause to arrest the Defendant on December 7.

On September 19 and October 5, 2012, the Court conducted an evidentiary hearing on the Motion to Suppress. The Defendant and his counsel, Thomas N. O'Malley, were present. Assistant United States Attorney Anthony W. Geller represented the Government. The Court heard witness testimony and reviewed submitted exhibits. At the conclusion of the hearing, the Court took the Motion under advisement and gave the parties additional time to file briefs. On December 4, the Defendant filed his Brief in Support of Motion to Suppress [ECF No. 40]. On January 8, 2013, the Government filed its Response [ECF No. 43]. On January 30, the Defendant filed his Reply [ECF No. 51]. This matter is now ripe for the Court's ruling.

**STATEMENT OF FACTS**

This case arises out of a series of negotiations and drug transactions in November and December 2011. DEA Special Agent Howard Schneider was the lead agent in the case, and

testified extensively at the September 19 and October 5 evidentiary hearing. SA Schneider first worked for five years as an Illinois police officer, and gained experience in drug investigations. Since 1998, SA Schneider has been a special agent with the DEA, completing ongoing training, and devoting all of his time to drug investigations, focusing on upper-level suppliers of cocaine and other drugs.

The person supplying information to the DEA in this case was a confidential informant, or confidential source (CS). The CS began working with the DEA after being charged in an Indiana state case. He cooperated with the DEA in exchange for dismissal of that state case, and after that continued to work with the DEA in exchange for monetary payment. According to SA Schneider, the CS in this case had provided information spanning multiple cases and multiple federal districts. SA Schneider considered the CS to be credible and reliable. The CS had no criminal convictions, and SA Schneider believed that independent police investigation heavily corroborated the information provided by the CS.

SA Schneider testified that because of the clandestine nature of illegal drug transactions, suppliers and buyers often use code words and do not discuss deals in explicit terms. Both suppliers and buyers are concerned that they may be robbed if others know that they possess either illegal drugs or the large quantities of cash used to purchase illegal drugs. In SA Schneider's opinion, "secretive conversation" is "an indication that it is a drug trafficking conversation." (Hr'g Tr. I 96:24–25, Sept. 19, 2012, ECF No. 41.)

The CS first worked with the DEA on a matter involving a potential drug dealer named Reynolds. On November 14, 2011, the CS met with three brokers, or middlemen, who were arranging drug transactions between drug buyers and the CS. The CS posed as a member of a

cocaine supplying organization. The brokers initiated the November 14 meeting with the CS, but the meeting was not recorded. At the November 14 meeting, the brokers stated that they had two interested buyers—one named Reynolds, and one nicknamed Superman. DEA Agents set up a reverse buy operation with Reynolds on November 17, in which the CS posed as a cocaine supplier and Reynolds brought money to complete the transaction. The reverse buy was successful; DEA agents arrested Reynolds and confiscated some cocaine and $30,000 in cash.

The brokers then initiated a November 27 meeting with the CS to discuss supplying cocaine to Superman. The brokers stated that Superman could produce approximately $300,000 to purchase cocaine. The CS and the brokers agreed at the November 27 meeting that the CS would supply 15 to 20 kilograms of cocaine at a price of $25,000 per kilogram, that the brokers would supply the cocaine to Superman at a profit, and that the buyers would only pay for 15 kilograms initially and would be fronted 5 kilograms. The November 27 meeting between the CS and the brokers was not recorded. At the November 27 meeting, the brokers also set up a meeting between the CS and Superman. Superman had specifically requested this meeting, and the brokers coordinated it for November 29 at an IHOP restaurant in Fort Wayne.

DEA agents outfitted the CS with a recording device for the November 29 meeting, though the device did not record the entire meeting because its battery did not last for the entirety of the meeting. Two of the middlemen attended the November 29 breakfast meeting. The person nicknamed Superman claimed to have gone to the wrong IHOP restaurant initially, but the CS declined to change the meeting location. SA Schneider testified that Superman's effort to switch the meeting location could have been a tactic to detect surveillance. Eventually, the CS, two of the brokers, one small child, and Superman met at the IHOP. One of the brokers left early

because of a medical appointment. A plain clothes DEA agent entered the IHOP, saw the individual nicknamed Superman, and later identified that individual as the Defendant using a photo array.

At the November 29 meeting, the parties discussed a cocaine transaction using code words, including "packages," "eggs," and "omelettes." (Tr. I 120.) The CS expressed a desire to see the Defendant's money, and the Defendant expressed a desire to see the CS's cocaine. The CS informed the Defendant that he had to see the money up front, but stated that the Defendant would not "have to do it." (Hr'g Tr. II 60:25, Oct. 5, 2012, ECF No. 42.) The CS also informed the Defendant that "it's guaranteed once you open the package. You don't like it, the same package, it goes back all that stuff." (Tr. II 63:6–8.) After seeing the money for the first transaction, the CS communicated that his organization could then provide cocaine on a weekly basis without the Defendant showing the money up front. (Tr. I 120:3–6.) The Defendant stated that he had purchased other cocaine through the brokers—possibly up to 90 kilograms at a price of $27,000 per kilogram—but that the quality of the cocaine previously purchased was not always good, and the Defendant was therefore looking for another supplier. The Defendant noted, however, that he would not be interested in a new supplier unless the price was good—a discount of more than $1000 per kilogram of cocaine. Moreover, the Defendant stated: "I've been doing this for like 26 years, so I've been through—never been to prison." (Tr. I 124:23–24.) The Defendant also stated that "people used to give him a hundred and tell him to just go," which SA Schneider interpreted to mean that the Defendant was used to being fronted drugs and paying later. (Tr. I 125:10–11.) The parties continued to discuss a deal whereby the CS would

supply 15 or 20 kilograms of cocaine[2] to the brokers, who would possibly purchase 15 and be fronted 5, and the Defendant would purchase the cocaine from the brokers. It is unclear whether the parties settled on a final price per kilogram of cocaine, though SA Schneider believed the price was set at $26,000 per kilogram on November 29. (Tr. II 69:10.) Pursuant to their discussion, the CS agreed to procure the cocaine from his fictitious organization, and to contact the brokers and the Defendant when the shipment was ready.

At some point between the November 29 meeting and December 3,[3] the Defendant called the CS unexpectedly. The call was not recorded, but DEA agents were able to verify that a call occurred between the Defendant's telephone and the CS's telephone. In the telephone conversation, the Defendant stated that he had his money together, believing the CS was ready to go. The CS explained that the shipment was not yet ready. The CS and the Defendant also discussed the possibility of shipping the drugs in a trap car, a vehicle outfitted with a secret compartment to conceal contraband.

On December 3, the CS and the Defendant exchanged text messages and a phone call. First, the Defendant texted the CS, stating that he was "[j]ust checking to make sure if we still good." (Tr. I 132:18–19.) Next, the Defendant texted the CS, stating his concern with the brokers because some people had told him to stay away from them. The CS texted back, stating that the shipment was ready but not yet in Fort Wayne, and that the deal could continue whether or not the brokers were included, at the Defendant's discretion. In a phone call on December 3, the

<hr/>

[2]SA Schneider testified that, in his opinion, 20 kilograms of cocaine constituted a distribution amount.

[3]The Government did not introduce the date of this telephone call, but SA Schneider testified that DEA agents were able to verify that a call occurred between the CS and the telephone number the CS said the Defendant was using at that time.

Defendant expressed his dissatisfaction with reports that one of the brokers was talking too much about the transaction. The Defendant stated, however, that he still wanted to compensate the brokers. Although a deal would usually go through with the brokers physically present, the Defendant discussed the possibility of paying the brokers off so that the Defendant could meet directly with the CS to perform the transaction. The CS stated that he would call the Defendant when he arrived in Fort Wayne with the shipment. The Defendant responded that they would "just talk then," but confirmed that they would "do something" after eating breakfast. (Gov't's Resp. 8, ECF No. 43.)

On the evening of December 5, in a recorded phone call, the CS told the Defendant that he was in town with the shipment, and was ready to sell the 15 or 20 kilograms of cocaine. The Defendant responded, stating: "I'll just come and talk to you." (Tr. II 81:5.) In SA Schneider's opinion, the Defendant's equivocal answer did not indicate that he was uninterested in the proposed deal as previously outlined, but indicated the Defendant's desire to prevent being robbed by suggesting that he would not have the money with him. The parties coordinated a breakfast meeting at another Fort Wayne restaurant for December 6.

The Defendant did not appear for the December 6 meeting. The Defendant did send text messages to the CS indicating that he was unable to get to the meeting on time, and that he had lost his phone.

On December 7, the Defendant told the CS over the telephone that he had been unable to contact the CS on December 6. The CS responded by informing the Defendant that he had sent the shipment of cocaine back because the Defendant did not purchase it on December 6, and that it had been purchased for prices in excess of $26,000 per kilogram. The CS asked the Defendant

if he was "ready to go right now." (Tr. II 9:19–20.) The Defendant responded: "Yeah. I'm trying, you know." Later the Defendant added that he would be ready "before dark." (Tr. II 9:20–21.)

In a later recorded call on December 7, the Defendant stated that he was "going to wait, because . . . I got about—about maybe like 21 points." (Tr. II 10:22–23.) In SA Schneider's opinion, this could have indicated that the Defendant was still gathering money to complete the deal. In another recorded call on December 7, the Defendant stated that he was going to let the brokers "do the 5," which SA Schneider testified meant that the Defendant wanted the brokers to be fronted 5 kilograms of cocaine, even if they did not attend the transaction. (Tr. II 13:15–23.) Additionally, the Defendant stated that he wanted the brokers to have "the opportunity to make a little." (Tr. II 14:7–8.) SA Schneider testified this meant the Defendant believed the brokers were entitled to some additional money besides the 5 kilograms of cocaine.[4] SA Schneider testified that the deal at this point involved the Defendant paying for 15 kilograms of cocaine, being fronted an additional 5 kilograms, and the brokers being fronted 5 kilograms of cocaine. (Tr. II 104:7–17.) The CS and the Defendant also discussed unloading the shipment of cocaine in a garage. The CS agreed to come to the Defendant's garage and "do it" the Defendant's way; the Defendant responded, stating: "Okay." (Gov't Resp. 10.) The Defendant added, however, that he was "just going to come," and that he was "not going to come with nothing." (*Id.*) In yet another call a few minutes later, the CS reiterated that he needed to see the money before delivering the cocaine, and the Defendant responded that the CS would have to follow him in order to see the money.

_____

[4]The Defendant had also stated in a December 7 text message that the brokers were "begging" him to deal with them. (Tr. I 146:5.)

The CS and the Defendant met at another IHOP restaurant in Fort Wayne at approximately 5:30 PM on December 7. DEA agents recorded the interactions between the Defendant and the CS. The Defendant circled the restaurant in his vehicle upon arriving at the IHOP. SA Schneider believed this was a counter-surveillance technique. The CS told the Defendant that he needed to see the purchase money. The Defendant responded that the CS would have to follow him so he could show him the money, and suggested they meet near the Glenbrook Mall so the CS could see the money. The CS mentioned the Red Robin restaurant at the Glenbrook Mall, and the Defendant responded: "[J]ust follow me up there." (Gov't's Resp. 11.)

On the way to the Glenbrook Mall, the Defendant hit his brakes suddenly and made a sharp right hand turn into a commercial area across the street from the Glenbrook Mall. The Defendant did not signal his turn, and because it was so sudden, surveillance officers would have been spotted by the Defendant if they had followed him. SA Schneider testified that this was a counter-surveillance technique used to detect undercover officers or anyone else who might have been following him. The Defendant then proceeded to the Mike's Car Wash in the parking lot of the Glenbrook Mall, approximately 400 feet from the Red Robin restaurant. The Defendant parked by the vacuum cleaners, and the CS joined him there.

On the way to the mall, the CS had communicated to DEA agents that he did not believe the Defendant had the money. However, upon arriving at the car wash, the Defendant opened his truck door and showed the CS something. The CS asked the Defendant to open the bag. Then the CS and the Defendant discussed the fictitious trap car that was supposedly on its way. The Defendant wanted the CS to drive the trap car instead of having a new person drive it. The CS

stated that he was "going to follow" the Defendant, and the Defendant responded with "Okay." (Gov't's Resp. 12.) The Defendant then pulled his truck into the car wash, and the CS communicated to DEA agents that he had seen the money. At that point, SA Schneider gave the order to arrest the Defendant. When the Defendant emerged from the car wash, he was met with uniformed DEA and FWPD officers with weapons drawn, flashing police lights, marked and unmarked police cars blocking his exit, and verbal commands that he stop and get out of the vehicle. The Defendant responded by swerving sharply to the right, striking the car wash building with the right side of his truck, and scraping it along the building from the front to the rear of the truck. He then brought his vehicle to a stop and got out of the truck, where FWPD Detective Joshua Hartup arrested him.

Detective Hartup searched the Defendant and found a pistol on his waistband, along with multiple extra magazines in his sweatshirt pocket. In the truck, agents found $353,000 in cash, two cellular phones, and an assault rifle with extra magazines.[5] After arresting the Defendant, officers searched the Defendant's home pursuant to a search warrant.

The Defendant advances two arguments in the briefs supporting his Motion to Suppress. He argues, first, that the DEA and FWPD officers did not have probable cause to arrest him for an attempt offense on December 7, 2011, because it was a condition of the emerging negotiations that he be able to inspect the cocaine before agreeing to purchase it, and because there was never any definite agreement as to the quantity of cocaine, the price, or the place of delivery. Second, the Defendant argues that officers did not have probable cause to arrest him for a conspiracy

_____

[5]Fort Wayne Police Department policy requires an inventory of a vehicle impounded pursuant to an arrest.

offense on December 7, 2011, because there was insufficient evidence to suggest a conspiracy between the brokers and the Defendant.

The Government responds that the offense of attempting to possess with intent to distribute illegal drugs does not require an agreement. On the contrary, an attempt offense is completed once a defendant acts with the specific intent to commit the underlying offense, and takes a substantial step towards its completion. Further, the Government argues that DEA and FWPD officers had probable cause, first, to believe that the Defendant had taken a substantial step towards possessing with the intent to distribute cocaine by negotiating a transaction over the course of more than a week, and by bringing a large sum of cash to the transaction; and second, to believe that the Defendant and the brokers had agreed that the brokers would locate and provide the Defendant with cocaine for distribution.

## CONCLUSIONS OF LAW

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). An arresting officer may search an arrestee incident to the arrest "in order to find weapons and to search for and seize any evidence on the arrestee's person." *United States v. Thomas*, 512 F.3d 383, 387 (7th Cir. 2008). Further, an arresting officer may "conduct a vehicle search when an arrestee is within reaching distance of the vehicle or it is reasonable to believe the vehicle contains evidence of the offense of arrest."

*Arizona v. Gant*, 556 U.S. 332, 346 (2009). An arresting officer may also search "any area of the vehicle in which the evidence might be found" if probable cause exists to believe that "a vehicle contains evidence of criminal activity." *Id.* at 347; *see United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) ("where there is probable cause to believe that a vehicle contains contraband or evidence of a crime, law enforcement may conduct a warrantless search of the vehicle"). As long as probable cause to search exists, it does not matter that law enforcement agents could have obtained a warrant. *Zahursky*, 580 F.3d at 523.

Probable cause to make an arrest exists when "the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *United States v. Sawyer*, 224 F.3d 675, 678–79 (7th Cir. 2000). Probable cause to search a vehicle exists when "based on a totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Zahursky*, 580 F.3d at 521 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime," *Sawyer*, 224 F.3d at 679 (citing *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir. 1992)), but the arresting officer's belief that the suspect had committed or was committing an offense must be reasonable, *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). Probable cause requires merely that the "totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part." *Sawyer*, 224 F.3d at 679 (citing *Gates*, 462 U.S. at 244). A "theoretically possible" alternate explanation for a defendant's conduct "does not negate the

existence of probable cause." *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006).

"Under the collective knowledge doctrine, the knowledge of one police officer is imputed to other officers when they are in communication regarding a suspect." *Reynolds v. Jamison*, 488 F.3d 756, 768 n.7 (7th Cir. 2007); *Sawyer*, 224 F.3d at 680. The collective knowledge doctrine applies "'when officers are in communication with each other while working together at a scene.'" *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (quoting *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)); *Sawyer*, 224 F.3d at 680 (stating that the doctrine applies "when the officers are all at the scene of an arrest"). The Seventh Circuit has stated that the principle behind the collective knowledge doctrine is that "law enforcement officers in diverse jurisdictions must be allowed to rely on information relayed from officers and/or law enforcement agencies in different localities in order that they might coordinate their investigations, pool information, and apprehend fleeing suspects in today's mobile society." *Nafzger*, 974 F.2d at 910.

An officer assessing the totality of the circumstances may rely upon special knowledge or expertise. *See United States v. Cortez*, 449 U.S. 411, 418 (1981) ("From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person."); *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (stating that the totality of the circumstances might include "the experience of the officer"). Driving circuitously "in an obvious effort to elude and frustrate attempted surveillance" is an example of conduct that officers may find significant in assessing the totality of the circumstances. *United States v. Marin*, 761 F.2d 426, 432 (7th Cir. 1985). While flight from the police "is not necessarily indicative of wrongdoing, . . . it is certainly suggestive of such." *Illinois v. Wardlow*,

528 U.S. 119, 124 (2000). A confidential informant's reliability is part of the totality of the circumstances, and such an informant's reliability is increased when law enforcement agents are able to confirm the informant's information. *See United States v. Washburn*, 383 F.3d 638, 642–43 (7th Cir. 2004). Controlled drug transactions coordinated by confidential informants are also part of the totality of the circumstances analysis, *Sidwell*, 440 F.3d at 869, and successful controlled drug transactions add to a confidential informant's reliability, *United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998).

"To prove that a defendant attempted to possess cocaine with intent to distribute, the government must establish that the defendant acted with the specific intent to commit the underlying offense, and further that he took a substantial step toward its completion." *United States v. Magana*, 118 F.3d 1173, 1198 (7th Cir. 1997). A substantial step is "something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime." *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000). "The act must be of such a nature that a reasonable observer viewing it in context could conclude . . . that it was undertaken in accordance with a design to violate the statute." *Id.* "[W]hen a defendant has been active in negotiating a drug transaction and has actually taken physical steps to obtain possession of the drug, the attempt offense is complete." *United States v. Wilks*, 46 F.3d 640, 645 (7th Cir 1995) (quotation marks omitted). Conversations in which parties negotiate the details of a drug transaction, combined with actions showing a readiness to proceed, can establish a substantial step towards completion of an offense. *Magana*, 118 F.3d at 1198–99; *Wilks*, 46 F.3d at 645. A jury may find that a defendant has taken a substantial step towards possession of cocaine with intent to distribute when the parties have not determined an exact price for the drug transaction.

*See United States v. Carrillo*, 435 F.3d 767, 777–78 (7th Cir. 2006).

To prove a conspiracy, the Government must prove that "two or more people agreed to commit an unlawful act" and that "the defendant[] knowingly and intentionally joined in the agreement." *Id.* at 775 (quoting *United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004)). A confidential informant working for the Government cannot be a conspirator. *United States v. Spagnola*, 632 F.3d 981, 986 (7th Cir. 2011). "Evidence establishing a buyer-seller relationship is not sufficient to support a conspiracy charge[,] [b]ut evidence showing a shared interest in continued sales over time is enough to permit the jury to draw the inference that a conspiracy exists." *Carrillo*, 435 F.3d at 775 (quotation marks and citations omitted). When a drug seller fronts drugs to another person, the seller "relies on his expectation that the retailer will repay the loan by committing the crime of selling the illegal drugs that he's acquired." *United States v. Moreland*, 703 F.3d 976, 985 (7th Cir. 2012). A court can therefore "infer conspiracy from a sale *on credit* of illegal drugs in a quantity *too great* to be for personal consumption." *Id.* A conspiracy does not require "a formal agreement to conspire," but may be established by "circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct." *United States v. Turner*, 93 F.3d 276, 282 (7th Cir. 1996) (quotation marks and citations omitted). A conspiracy also does not require a consensus on the details of a drug transaction. *United States v. Gilmer*, 534 F.3d 696, 702 (7th Cir. 2008). A broker in a drug transaction can be a co-conspirator where the broker has agreed to purchase drugs for distribution by another. *United States v. Garcia*, 89 F.3d 362, 365 (7th Cir. 1996); *see Gilmer*, 534 F.3d at 702.

**A.     Government Agents Had Probable Cause to Arrest the Defendant for Attempt**

The Defendant argues that under the totality of the circumstances SA Schneider and other DEA and FWPD officers did not reasonably believe that he had committed or was committing the offense of attempting to possess cocaine with the intent to distribute it. He insists that although he and the brokers negotiated a drug transaction over the course of more than two weeks, he did not attempt to possess with intent to distribute cocaine because he had reserved a right to inspect the quality of the cocaine before completing the deal, and because the parties had not yet reached a final agreement on the amount of cocaine to be sold, the price for the cocaine, or the place of delivery. The Government argues that the Defendant's attempt offense was complete when he acted with the specific intent to commit the offense of possession, and when he took a substantial step towards its completion. Further, the Government argues that an attempt offense does not require an agreement between parties at all. As to the Defendant's insistence that he had a right to inspect the cocaine before the deal was complete, the Government argues that the Defendant completed an attempt when he flashed the money to the CS, and that at that point it was a reasonable inference based on the Defendant's counter-surveillance techniques and his previous negotiations with the CS that he was ready to complete the transaction.

The Court agrees with the Government that probable cause existed to arrest the Defendant for the offense of attempting to possess with the intent to distribute cocaine on December 7, 2011. As the Government notes, the offense of attempt is complete when a defendant acts with the specific intent to complete the offense, and takes a substantial step towards completing the offense. *Magara*, 118 F.3d at 1198. In this case, evidence known to law enforcement officers showed that at the time of his arrest, the Defendant had actively negotiated

16

a large illegal drug transaction over the course of many days and many conversations; had utilized counter-surveillance tactics when negotiating the transaction including use of code words, deception, and movement techniques; had been informed that the trap car with the drugs was on its way to his location; had showed the CS the money for the transaction; and had insisted that the CS drive the trap car to the garage location for the transaction. The Defendant argues that the proposed transaction was too uncertain and that a reasonable law enforcement officer would not have believed that he either had committed or was committing the offense of attempt. But many of the Defendant's arguments presuppose the time before he had shown the money to the CS. It is true that for days the Defendant made different statements suggesting he would not be bringing the money when he came to talk to the CS. SA Schneider pointed out that this is a common tactic used by drug dealers who do not wish to be robbed while in possession of large amounts of cash. The Defendant argues that no reasonable officer would have believed he was ready to complete the transaction because he kept saying he would not bring the money. But SA Schneider did not make the decision to arrest the Defendant until after the Defendant had shown the money to the CS. At that point, it was reasonable to believe that the Defendant, after days of negotiating and after many instances of misdirection, was in fact ready to complete the offense of possession. Thus, SA Schneider had probable cause to believe that the Defendant had taken a substantial step towards completion of the offense.

The Defendant also argues that even once DEA and FWPD agents learned that the CS had seen the money, probable cause did not exist to arrest him because the parties had not reached a final agreement as to the amount, price, or place of delivery. However, as stated above, "[w]hen a defendant has been active in negotiating a drug transaction and has actually taken

physical steps to obtain possession of the drug, the attempt offense is complete." *Wilks*, 46 F.3d at 645. Here the Defendant had actively negotiated the transaction, and had taken the physical step of showing the CS a large amount of money. Furthermore, conversations in which parties negotiate the details of a drug transaction, combined with actions showing a readiness to proceed, can establish a substantial step towards completion of an offense. *Magana*, 118 F.3d at 1198–99 (finding reasonable evidence of a substantial step towards completion of the offense of attempt to posses with intent to distribute cocaine where the parties negotiated a deal for 15 kilograms of cocaine but the supplier only delivered three kilograms and where the buyer temporarily put the rest of the deal on hold). Here, the Defendant engaged in many conversations negotiating the details of the transaction, and although he arguably put the deal on hold by not showing up on December 6, he appeared ready to complete at least part of the transaction on December 7 when he flashed the money. Moreover, a jury may find that a defendant has taken a substantial step towards possession of cocaine with intent to distribute when the parties have not determined an exact price for the drug transaction. *See Carrillo*, 435 F.3d at 777–78 (finding evidence of a substantial step towards attempted possession with intent to distribute cocaine where there was no agreement as to whether the buyer would provide $150,000 or $105,000). The Defendant's negotiations with the CS included discussion of a price of $25,000 per kilogram, SA Schneider testified that the price under discussion changed to $26,000 per kilogram, and most of the discussions appeared to contemplate the Defendant paying for 15 kilograms and being fronted 5 kilograms. The CS and the Defendant also discussed that the next stage of the transaction would occur at a garage already chosen by the Defendant. In this case, the Court finds that DEA and FWPD agents had probable cause to believe the discussions

between the parties were definite enough as to the amount, price, and place of delivery that the Defendant's act of flashing the money to the CS constituted a substantial step towards the completion of the offense. The Defendant urges that if he were sophisticated enough to engage in complex counter-surveillance techniques then surely he would have been able to negotiate a final price and quantity for the deal. The Court finds that the totality of the evidence known to Government agents on December 7 suggested that the Defendant had a high level of sophistication in drug dealing, and that uncertainty as to the exact amount and exact price did not cut against the reasonable conclusion that the Defendant was a seasoned drug dealer who was ready to purchase a distribution quantity of cocaine.

The Defendant argues that he showed his intention to cancel the nascent deal by not showing up for the transaction on December 6, and by going to Mike's Car Wash on December 7 instead of to the Red Robin restaurant. SA Schneider pointed out multiple reasons that might have motivated the Defendant to fail to appear on December 6, including a desire to evaluate the security of the site through counter-surveillance, a desire to delay in order to gather all the money needed for the transaction, a need to deal with a personal or family matter, or even the Defendant's stated reason—that he lost his phone and was delayed by work. The Court agrees with the Government that the Defendant's failure to appear on December 6 did not negate probable cause on December 7, particularly in light of the Defendant's assurances to the CS on both December 6 and December 7 which had the effect of keeping the transaction going. As to the Defendant's argument that he failed to appear for the transaction on December 7 because he drove to the Mike's Car Wash instead of the Red Robin, the Court finds that the Defendant never said he was going to the Red Robin; he merely responded that the CS should follow him after the

CS suggested the Red Robin. Therefore, the Defendant's appearance at a location 400 feet across the parking lot from the location suggested by the CS does not negate probable cause to believe that the Defendant was interested in completing the drug transaction. In light of the Defendant's demonstrated penchant for counter-surveillance tactics, his change of locations would not suggest to a reasonable officer evaluating the situation that he was cancelling the deal.

The Defendant also argues that because he stated on December 3 and December 5 that he "just wanted to talk," no reasonable officer would believe he was ready to complete a deal on December 7. The Court finds that the Defendant's actions after making statements of this sort, in particular his showing the money to the CS, undercut his argument. DEA and FWPD officers knew that the Defendant—in spite of his statements to the contrary—had the money. His continual negotiations reasonably suggested that he wanted to do more than just talk. It was reasonable to conclude that probable cause existed to believe the Defendant had committed or was committing the attempt offense in spite of his previous statements that he just wanted to talk.

The Defendant argues, concerning one of the recorded phone calls on December 7, that his statement that he was trying to be ready and would be ready before dark somehow vitiates probable cause. The Court finds that this statement does just the opposite. As the Defendant admits, "[h]e is trying to be ready." (Def.'s Reply 7, ECF No. 51.) He expects to be ready before dark. This admission—coupled with the Defendant's act of showing the money to the CS—shows that the Defendant intended to purchase the cocaine and took a substantial step towards the completion of the transaction.

The Defendant maintains, finally, that probable cause did not exist to arrest him for the attempt offense because he had the right to inspect the shipment before accepting the cocaine. He

insists that because he was holding to his right to inspect the cocaine before completing the transaction, he did not attempt to possess it because he did not inspect it. The Government notes that although the Defendant might have hypothetically refused the shipment based on his inspection, that alternate explanation does not undercut probable cause. The Court agrees. While the scenario set forth by the Defendant is "theoretically possible . . . it does not negate the existence of probable cause." *Sidwell*, 440 F.3d at 869. The Defendant's argument is that the entire transaction was contingent upon his inspection of the shipment. But although a completed transaction might have been contingent on the Defendant's inspection, a completed attempt to possess cocaine with the intent to distribute by means of taking a substantial step to possess it did not depend on the Defendant's inspection of the cocaine. Put another way, probable cause existed to believe that the Defendant had committed the attempt offense in spite of the alleged contingency in the deal.

Probable cause does not require facts sufficient to support a conviction, nor does it require evidence that the Defendant had more likely than not committed a crime; rather, probable cause requires that under the totality of the circumstances, there is a probability or substantial chance of criminal activity on the suspect's part. *Sawyer*, 224 F.3d at 679. In the totality of the circumstances considered in this case, officers used their specialized knowledge and expertise to evaluate the Defendant's counter-surveillance tactics, *Cortez*, 449 U.S. at 418, particularly his circuitous driving, *Marin*, 761 F.2d at 432; they considered that the CS had previously[6] shown

---

[6]The Defendant argues that DEA and/or FWPD officers did not independently corroborate the CS's information because they did not know whether the Defendant actually intended to complete the transaction on December 7. The Defendant's argument misses the point. DEA agents corroborated the CS's information through the successful reverse buy operation with Reynolds in November. The previous corroboration of the CS was what bolstered the credibility of the CS on December 7. Previous

himself to be credible and reliable[7] by coordinating a successful controlled drug transaction, *McKinney*, 143 F.3d at 329; and they considered that a suspect who has carefully guarded information about the location of the money will not idly show the money unless he is serious about the transaction.[8] Given the totality of the circumstances, the Court finds that probable cause existed to arrest the Defendant for the offense of attempting to possess with intent to distribute cocaine on December 7, 2011, because there was a probability or substantial chance of criminal activity on the Defendant's part, *Sawyer*, 224 F.3d at 679; because the DEA and FWPD officers' belief that the Defendant had committed or was committing the offense of attempt was a reasonable belief, *Qian*, 168 F.3d at 953; and because a reasonable observer viewing the Defendant's actions in context could conclude that his actions were undertaken in accordance with a design to violate the statute, *Barnes*, 230 F.3d at 315.

corroboration is significant precisely because contemporary corroboration is often impossible.

[7]The Defendant also argues that, concerning the November 27 meeting between the CS and the brokers where they discussed the emerging deal, it is the reliability of the brokers, and not the reliability of the CS, that is relevant. The Court finds that the brokers were shown to be reliable in their assertions regarding the Defendant's desire to perform a deal and ability to perform. The Defendant's actions in attending the November 29 meeting set up by the brokers and continuing to negotiate a deal along the general contours of the initial negotiations serve to corroborate the brokers' assertions. Furthermore, the Defendant has not shown any motive the brokers would have had to misrepresent the Defendant's position on November 27. The brokers may have desired to make a profit, but nothing suggests they would have misrepresented the Defendant's position in order to do so. And the Defendant's actions, as discussed, suggest that the brokers were accurately representing his position.

[8]The Government urges that the Defendant's attempt to flee from the car wash also goes to the totality of the circumstances and suggests the Defendant had committed or was committing a crime. *See Wardlow*, 528 U.S. at 124 (stating that flight from the police is generally suggestive of wrongdoing). The Court disagrees for two reasons. First, as noted by the Defendant, his action in swerving to the right may have been a product of his surprise at emerging from the car wash and finding armed men with firearms drawn blocking his path. It may not have represented an attempt to flee at all. Further, the decision to arrest the Defendant came before he swerved upon exiting the car wash; accordingly, the Defendant's reaction did not figure into SA Schneider's decision to order the Defendant's arrest. In *Wardlow*, the officer decided to investigate the defendant "*after* observing him flee." 528 U.S. at 124 (emphasis added). Accordingly, the Court will not consider evidence of flight as part of the totality of the circumstances leading to a probable cause determination in this case.

As articulated above, the Defendant's only argument is that officers lacked probable cause to arrest him on December 7. Finding that the officers had probable cause to arrest the Defendant for an attempt offense and probable cause to believe that his vehicle contained evidence of criminal activity, the searches of the Defendant's vehicle and person were both proper. *See Gant*, 556 U.S. at 346–47; *Thomas*, 512 F.3d at 387. Additionally, the search of the Defendant's home pursuant to a warrant would likewise have been proper as the Defendant presents no other basis to challenge the search. Accordingly, the Court will deny the Defendant's Motion to Suppress as to probable cause for an attempt offense.

**B.      Government Agents Had Probable Cause to Arrest the Defendant for Conspiracy**

The Defendant argues that on December 7 DEA and FWPD officers had no evidence that the brokers and the Defendant were engaged in a conspiracy whereby the brokers would supply cocaine to the Defendant. Nor, the Defendant argues, was there evidence of past or future agreements between the Defendant and the brokers. The Government responds that ample evidence supported arresting the Defendant for conspiracy to possess with intent to distribute cocaine on December 7.

The Court agrees with the Government that probable cause existed to believe that the Defendant and the brokers had conspired to possess with the intent to distribute cocaine on December 7, 2011. The Court thus disagrees with the Defendant's assertion that a conspiracy is "totally unsupported by any facts" before the Court. (Def.'s Reply 16.) The brokers met with the CS on November 27 and discussed their relationship with the Defendant, specifically that they would provide him with cocaine. The Defendant insists that no probative evidence exists as to

this alleged conversation because the brokers are not reliable witnesses. But, as discussed above, the Defendant has not shown why the brokers would have misrepresented their relationship with the Defendant, or the Defendant's intentions going forward; indeed, the Defendant's actions in this case serve to corroborate the brokers' November 27 statements as to both. The Court is also unpersuaded by the Defendant's argument that if the brokers had actually set up a deal on November 27 there would have been no need for a meeting on November 29. The record shows that the contours of the deal were set through ongoing negotiations. No evidence suggests the negotiations could not have begun on November 27.

As to the Defendant's argument that the Defendant suggested on November 29 that he had multiple sources of cocaine, the Court finds it irrelevant as to whether the Defendant agreed that the brokers would provide him cocaine in this particular deal. On November 29, the parties discussed the Defendant's past relationship with the brokers. They discussed the Defendant having purchased up to 90 kilograms of cocaine through these brokers. Whether the Defendant and the brokers had an exclusive relationship or not, the evidence known to law enforcement officials on December 7 certainly suggested a conspiracy. The Defendant may have been upset that one of the brokers was running his mouth too much about the deal, and may have had some concerns about the brokers. But the Defendant also took definite steps to keep the brokers in the deal. He specifically told the CS on December 7 that he wanted the brokers to be fronted 5 kilograms of cocaine and that he also wanted them to have "the opportunity to make a little." Further, the discussions on November 29 involved an ongoing arrangement whereby the CS's organization would supply cocaine to the Defendant through the brokers on a weekly basis. This contemplated ongoing relationship is evidence of a drug conspiracy. *Carrillo*, 435 F.3d at 775

(stating that "evidence showing a shared interest in continued sales over time is enough to permit the jury to draw the inference that a conspiracy exists"). In the November 29 discussions, the Defendant also stated that he was concerned about finding high quality cocaine and would only agree to work with the CS's organization if he obtained a favorable price. All of this suggests that the brokers were in the deal to purchase drugs from a favorable seller in a distribution quantity, for distribution by the Defendant, which is evidence of a conspiracy. *See Garcia*, 89 F.3d at 365 (stating that a broker's agreement to purchase drugs for distribution by another "does constitute a conspiracy"); *see also Gilmer*, 534 F.3d at 702. The Defendant's negotiations on the brokers' behalf on December 7 suggested that the brokers had a financial stake in the deal, both in terms of cocaine and money they would receive. In short, there was evidence that the Defendant and the brokers had agreed to commit the possession offense, and that they had intentionally joined in the agreement. *See Carrillo*, 435 F.3d at 775. Based on all of this evidence, it was reasonable for officers to conclude, assessing the totality of the circumstances, that the Defendant and the brokers had conspired to possess with the intent to distribute cocaine.

Finding that probable cause existed to arrest the Defendant for conspiracy on December 7, that probable cause existed to believe that his car contained contraband or evidence, that probable cause justified searches of his vehicle and person, and that the Defendant has not shown why a search of his home pursuant to a warrant was improper, the Court will also deny the Defendant's Motion to Suppress as to probable cause for a conspiracy offense.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court DENIES the Defendant's Motion to Suppress [ECF

No. 24]. A telephonic final pretrial conference is SET for March 5, 2013, at 3:00 PM before Judge Theresa L. Springmann. The Court will initiate the call. Any plea agreement in this matter shall be filed no later than the time of the telephonic final pretrial conference. The three (3) day jury trial is SET to begin on March 19, 2013, at 8:30 AM before Judge Theresa L. Springmann.

SO ORDERED on February 25, 2013.


 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT