**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:11-CR-78-TLS |
| | ) | |
| SHAFT JONES | ) | |

**OPINION AND ORDER**

On December 22, 2011, the Government filed a three-count Indictment [ECF No. 13] alleging that the Defendant, Shaft Jones, conspired to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count 1); attempted to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count 2); and carried a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 3). The case proceeded to a jury trial from August 12–18, 2014. The jury convicted the Defendant on all three counts. An officer with the United States Probation Office prepared a Presentence Investigation Report (PSR) prior to the Defendant's sentencing. According to the PSR, under the United States Sentencing Guidelines, the Defendant's total offense level is 34, and his criminal history category is II, resulting in a guideline range of 168–210 months of imprisonment for Counts 1 and 2, and a statutory minimum sentence of 60 months of imprisonment for Count 3.

On March 6, 2015, the Defendant filed a Sentencing Memorandum [ECF No. 169], in which he objects to the base offense level, as calculated in the PSR, for an offense involving 50 to 150 kilograms of cocaine. The Defendant contends that his offense involved less than 50

kilograms of cocaine.[1] On April 10, 2015, the Government filed a Response [ECF No. 169], in which it concurs with the base offense level, as calculated in the PSR, and requests an upward variance pursuant to 18 U.S.C. § 3553(a), due to the nature and circumstances of the Defendant's offense. On April 21, 2015, the Defendant filed a Reply [ECF No. 170]. On October 1, 2015, the Court conducted an evidentiary hearing regarding the Defendant's objection to the PSR. At the conclusion of the hearing, the parties indicated to the Court that no additional briefing or submissions are necessary.

For the reasons stated in this Opinion and Order, the Court will overrule the Defendant's objection as to his base offense level. The Court will also grant the Government's request for an upward variance from the advisory guideline range, finding that a guideline range of 210–262 months of imprisonment is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

## FINDINGS OF FACT

"At sentencing, a district court need only make findings of fact, such as the quantity of drugs attributable to a defendant, by a preponderance of the evidence." *United States v. Davis*, 682 F.3d 596, 612 (7th Cir. 2012) (citing *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008), *overruled on other grounds by United States v. Taylor*, 778 F.3d 667, 669 (7th Cir. 2015). "A proposition proved by a preponderance of the evidence is one that has been shown to be more likely than not." *Id*. The Federal Rules of Evidence do not apply to sentencing, *United States v.*

---

[1]The Court notes that in his Sentencing Memorandum, the Defendant states that, notwithstanding his arguments related to his base offense level, "he continues to maintain his innocence and denies that there was ever any agreement for him to purchase cocaine or that he was involved in any drug transactions." (Def's Sentencing Mem. 1.)

*Dean*, 414 F.3d 725, 730 (7th Cir. 2005), and a court may rely on hearsay as long as the information "has sufficient indicia of reliability to support its probable accuracy," *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008) (citation and quotation marks omitted). *See also United States v. Bradley*, 628 F.3d 394, 400 (7th Cir. 2010) ("[s]entencing judges necessarily have 'discretion to draw conclusions about the testimony given and evidence introduced at sentencing,' but 'due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations.'") (quoting *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009)). As such, "[a] district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information." *Rollins*, 544 F.3d at 838. "The defendant bears the burden of proving that the PSR is inaccurate or unreliable," and if he offers no evidence to question the PSR's accuracy, the court may rely on it. *Id.*

Here, the testimony of the witnesses, the recordings of intercepted communications, and other evidence presented to the Court establish internal corroboration that lend a sufficient indicia of reliability to the facts asserted in the PSR. The Defendant does not offer countervailing evidence that calls the reliability or correctness of the facts into question. Having fully considered the information from the various sources that provide a sufficient indicia of reliability to support the information's probable accuracy, the Court finds the facts set forth below to have been established by a preponderance of the evidence.

**A.      Background**

This case arises out of a series of negotiations and drug transactions in November and December 2011. DEA Special Agent Howard Schneider was the lead agent in the case, and

testified extensively at the pre-trial evidentiary hearings on September 19 and October 5, 2012; at the trial from August 12–18, 2014; and at the post-trial evidentiary hearing on October 1, 2015. Schneider first worked for five years as an Illinois police officer, and gained experience in drug investigations. Since 1998, Schneider has been a special agent with the DEA, completing ongoing training, and devoting his time to drug investigations, focusing on upper-level suppliers of cocaine and other drugs.

The person supplying information to the DEA in this case was a confidential informant, or confidential source (CS). The CS began working with the DEA after being charged in an Indiana state case. He cooperated with the DEA in exchange for dismissal of that state case, and after that continued to work with the DEA in exchange for monetary payment. According to Schneider, the CS provided information spanning multiple cases and multiple federal districts. Schneider considered the CS to be credible and reliable. The CS had no criminal convictions, and Schneider believed that independent police investigation heavily corroborated the information provided by the CS.

**B.      Drug Negotiations with the Defendant and his Brokers**

On November 14, 2011, the CS—who was posing as a member of a cocaine supplying organization—met with three brokers, or middlemen, who were arranging drug transactions between drug buyers and the CS.[2] The brokers initiated the November 14 meeting with the CS, but the meeting was not recorded. At the meeting, the brokers stated, in part, that they had an

_____

[2]According to Schneider, the role of a broker is to introduce a buyer and a seller. A broker is typically compensated in either cash, drugs or some other commodity.

interested buyer whose nickname was "Superman." The brokers then initiated a November 27 meeting with the CS to discuss supplying cocaine to Superman. According to the brokers, Superman could produce approximately $300,000 to purchase cocaine. The CS and the brokers agreed that the CS would supply 20 kilograms of cocaine at a price of $25,000 per kilogram, that the brokers would supply the cocaine to Superman at a profit, and that Superman would only pay for 15 kilograms initially (in cash) and would be fronted (i.e., provided on a consignment basis) 5 kilograms. The November 27 meeting between the CS and the brokers was not recorded. At the November 27 meeting, the brokers also set up a meeting between the CS and Superman. Superman had specifically requested this meeting, and the brokers coordinated it for November 29 at an IHOP restaurant in Fort Wayne.

DEA agents outfitted the CS with a recording device for the November 29 meeting, though the device did not record the entire meeting because its battery ran out. At the meeting, the CS and Superman were accompanied by two of the middlemen, Ignacio Pizano-Guzman ("Primo"), Luis Serrato-Diaz ("Tony"). A plain clothes DEA agent entered the restaurant, saw the individual nicknamed Superman, and later identified that individual as the Defendant using a photo array.

At the November 29 meeting, the parties discussed a cocaine transaction using code words, including "eggs" and "omelettes" to reference kilos of cocaine.[3] According to the

[3]The CS explained the use of code words at trial:

"[Government Attorney:] During the meeting, then, [are] there any terms that come up as code for kilograms of cocaine? [CS:] Yes . . . We were in [an] IHOP breakfast house, and when you['re] talking in codes, you try to talk about what's right next to you, I mean, in my case and we just started talking about omelettes and eggs, referring to kilos of cocaine. [Government Attorney:] So an egg or omelette, that's a kilo of cocaine? [CS:] If you're a real drug dealer, you should be able to pick it up."

testimony of the CS, the Defendant stated that he purchased other cocaine—up to 90 kilograms at a price of $27,000 per kilogram—through a supplier that Tony introduced him to, but the quantity and quality of the cocaine was deficient, and the Defendant was therefore looking for another supplier. The Defendant noted, however, that he would not be interested in a new supplier unless the price was satisfactory (i.e., the price was $1,000 or less per kilogram than what he is paying his current supplier). Moreover, the Defendant stated: "I've been doing this for like 26 years, so I've been through—never been to prison." (Gov. Ex. 2.) The Defendant also stated that "people used to just give [him] a hundred of them and they'd be like 'Go,'" (Gov. Ex. 2), which Schneider interpreted to mean that the Defendant was accustomed to being fronted kilograms of cocaine and paying later.[4] Jones informed the CS that, prior to the meeting, he showed the brokers $300,000 in cash, which would be used to complete the first drug transaction. The CS then communicated that his organization could provide the Defendant with cocaine on a weekly basis with no "dry season."[5] The parties negotiated a transaction whereby the Defendant would purchase (with cash) 15 kilograms of cocaine and would be fronted an

---

(Trial Tr. 186, Aug. 13, 2014, ECF No. 181.)

[4]Schneider offered the following testimony:

"[Government Attorney: The Defendant] essentially says that, you know, he will have someone who will give him a hundred of them and just say go. What does that mean to you, the "just say go" part? [Schneider:] What it means to me is that the person, the source of supply, the seller has trust within the buyer, [the Defendant], because what he has done is given a hundred kilograms to [the Defendant] with a promise by [the Defendant] that he will come back and pay for those hundred kilograms at a later date. [Government Attorney:] Okay. Is that then an indication of distribution? [Schneider:] Yes."

(Trial Tr. 61, Aug. 15, 2014.)

[5]According to Schneider, a "dry season" is a time when a seller or distributor is not able to get the drugs themselves," so "[t]hey don't have any product to be able to move it." (Trial Tr. 65, Aug. 15, 2014.)

additional 5 kilograms. The Defendant would pay $26,000 per kilogram. Pursuant to their discussion, the CS agreed to procure the cocaine from his fictitious organization, and to contact the brokers and the Defendant when the shipment was ready.

On November 29, following the meeting, the Defendant called the CS unexpectedly. The call was not recorded, but DEA agents were able to verify that a call occurred between the Defendant and the CS. During the call, the Defendant, believing the CS was ready to consummate the drug transaction, stated that he had his money together. The CS explained that the shipment was not yet ready. The CS and the Defendant also discussed the possibility of shipping the drugs in a trap car, or a vehicle outfitted with a secret compartment to conceal contraband.

On December 3, the CS and the Defendant exchanged text messages and a phone call. First, the Defendant texted the CS, stating that he was "[j]ust checking to make sure if we still good." (Gov. Ex. 67.) The Defendant texted the CS again, stating his concern with the brokers because some people had told him to stay away from them. The CS texted back, stating that the shipment was ready but not yet in Fort Wayne, and that the deal could continue whether or not the brokers were included, at the Defendant's discretion. In a recorded phone call on December 3, the Defendant expressed his dissatisfaction with reports that one of the brokers, Primo, was talking too much about the transaction. The Defendant stated, however, that he still wanted to compensate the brokers. Although a deal would usually go through with the brokers physically present, the Defendant discussed the possibility of paying the brokers off so that the Defendant could meet directly with the CS to perform the transaction. The CS stated that he would call the Defendant when he arrived in Fort Wayne with the shipment.

On December 5, in a recorded phone call, the CS told the Defendant that he was in town with the shipment, and was ready to sell the 20 kilograms of cocaine. The parties coordinated a breakfast meeting at another Fort Wayne restaurant for December 6. The Defendant did not appear for the meeting. The Defendant sent text messages to the CS indicating that he was unable to get to the meeting on time, and that he had lost his phone.

On December 7, the Defendant told the CS over the phone that he had been unable to contact the CS on December 6. The CS responded by informing the Defendant that he had sent the shipment of cocaine back because the Defendant did not purchase it on December 6, and that it had been purchased for prices in excess of $26,000 per kilogram. The CS then informed the Defendant that he would procure more cocaine, to which the the Defendant responded that he was ready to consummate the deal.

In a later recorded call on December 7, the Defendant stated that he was "going to wait, because . . . I got about—about maybe like 21 points left." (Gov. Ex. 11b.) In Schneider's opinion, this could have indicated that the Defendant was still gathering money to complete the deal. In another recorded call on December 7, the Defendant stated that he was going to let the brokers "do the 5," which, according to Schneider's testimony, meant that the Defendant wanted the brokers to be fronted 5 kilograms of cocaine, even if they were not physically present for the transaction. (Gov. Ex. 13a; Hr'g Tr. 13, Oct. 5, 2012.) Additionally, the Defendant stated that he wanted the brokers to have "the opportunity to make a little." (*Id.*) Schneider testified that this meant the Defendant believed the brokers were entitled to some additional money besides the 5 kilograms of cocaine. The CS and the Defendant also discussed unloading the shipment of cocaine in a garage. The CS agreed to come to the Defendant's garage to complete the

transaction.

**C.     The Defendant's Arrest**

The CS and the Defendant met at another restaurant in Fort Wayne at approximately 5:35 PM on December 7. DEA agents recorded the interactions between the Defendant and the CS. The Defendant circled the restaurant in his vehicle, a Cadillac Escalade, upon arriving at the restaurant. The CS told the Defendant that he needed to see the purchase money. The Defendant suggested they meet near the Glenbrook Mall so the CS could see the money.

On the way to the Glenbrook Mall, the Defendant hit his brakes suddenly and made a sharp right-hand turn into a commercial area across the street from the Glenbrook Mall. The Defendant did not signal his turn, and because it was so sudden, surveillance officers would have been spotted by the Defendant if they had followed him. Schneider testified that this was a counter-surveillance technique used to detect undercover officers or anyone else who might have been following him. The Defendant then proceeded to a car wash in the parking lot of the Glenbrook Mall. The Defendant parked his vehicle at the car wash and the CS joined him there. The Defendant then opened his truck door and showed the CS at least 20 bundles of money, which was consistent with a large sum of cash. The CS and the Defendant then discussed the fictitious trap car that was supposedly on its way. The Defendant wanted the CS to drive the trap car and follow the Defendant to the undisclosed location, to which the CS agreed.

While awaiting the trap car's arrival, the Defendant pulled his vehicle into the car wash, and the CS communicated to DEA agents that he had seen the money. At that point, Schneider gave the order to arrest the Defendant. When the Defendant emerged from the car wash, he was

met with uniformed DEA and FWPD officers with weapons drawn, flashing police lights, marked and unmarked police cars blocking his exit, and verbal commands that he stop and get out of the vehicle. The Defendant responded by swerving sharply to the right, striking the car wash building with the right side of his truck, and scraping it along the building from the front to the rear of the truck. In the opinion of DEA agents on the scene, the Defendant was attempting to flee. He then brought his vehicle to a stop and got out of the truck, where FWPD Detective Joshua Hartup arrested him.

Detective Hartup searched the Defendant and found a loaded pistol on his waistband, along with multiple extra magazines in his sweatshirt pocket. In the passenger compartment of the truck, agents found $353,443 in cash, along with an M-4 assault rifle with four fully-loaded 30-round magazines and a night vision scope. After arresting the Defendant, officers searched the Defendant's home pursuant to a search warrant. In the garage of the home, officers located a vehicle, an Oldsmobile Starfire, registered to the Defendant and to which the Defendant's wife identified as belonging to him. In the trunk of the vehicle, officers recovered $315,221 in cash; and in the residence, officers located, in part, $6,059 in cash, two handguns, ammunition, a stun gun, a digital scale, a bullet proof vest, and a money counter.

Additionally, at the time of the Defendant's arrest, officers located on the Defendant's person a deposit receipt at Wells Fargo Bank, which listed a $9,000 cash deposit on August 26, 2011. After discovering that the Defendant possessed multiple accounts at Wells Fargo Bank, DEA officers, pursuant to a search warrant, seized $221,546 from these accounts.

**ANALYSIS**

When sentencing a defendant, the district court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see United States v. Panice*, 598 F.3d 426, 441 (7th Cir. 2010) (citing *Nelson*, and setting forth the two-step process that a sentencing court must engage in to determine a defendant's sentence).

**A.        Guideline Calculation – Drug Quantity**

Section 1B1.3(a)(2) of the United States Sentencing Guidelines, entitled "Relevant Conduct (Factors that Determine the Guideline Range)," provides that, with a narcotics conviction, the district court should determine the base offense level for sentencing purposes by considering "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." "Two offenses are part of the same course of conduct where they are 'connected or sufficiently related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'" *United States v. Purham*, 754 F.3d 411, 414 (7th Cir. 2014) (quoting U.S.S.G. § 1B1.3 cmt. n. 9(B)). Likewise, two offenses "are part of a common scheme or plan if they are 'substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.'" *Id.* (quoting U.S.S.G. § 1B1.3 cmt. n. 9(A)); *see United States v. Vaughn*, 722 F.3d 918, 932 (7th Cir. 2013) ("where a defendant sells drugs, albeit to different purchasers, for an extended period of time with little or no break

leading up to the charged offense, it is much more likely that the sales are part of the same common scheme or plan as the offense of conviction.")

Because the determination of drug quantities is often a difficult task, "the sentencing guidelines permit some amount of reasoned speculation and reasonable estimation by a sentencing court." *United States v. Hollins*, 498 F.3d 622, 631 (7th Cir. 2007) (internal quotation marks and citation omitted); *United States v. Rodriguez*, 67 F.3d 1312, 1325 (7th Cir. 1995) ("Recognizing that drug dealers ordinarily do not use invoices and bills of lading, we have held that sentencing courts may make reasonable estimates as to drug quantities."). Notwithstanding, when making a drug quantity determination, a court "should normally 'err on the side of caution[.]'" *United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015) (quoting *United States v. Beler*, 20 F.3d 1428, 1436 (7th Cir. 1994).

Here, the PSR includes a drug quantity of 54.2 kilograms of cocaine. This figure includes the 20 kilograms of cocaine that the Defendant intended to purchase from the CS, along with a conversion of the $890,210 seized by law enforcement (i.e., $353,443 from the Defendant's Cadillac Escalade, $315,221 from the Defendant's Oldsmobile Starfire, and $221,546 from the Defendant's bank accounts) into a cocaine amount of 34.2 kilograms. *See United States v. Rivera*, 6 F.3d 431, 446 (7th Cir. 1993) (a court is permitted to convert seized currency into an equivalent amount of the charged drug). The conversion is based on a per kilogram price of $26,000. Because the probation officer concluded that the Defendant's offense involved 54.2 kilograms of cocaine, the Guidelines assign a base offense level of 34. U.S.S.G. § 2D1.1(c)(2). The total offense level of 34 and criminal history category of II results in a guideline range of 168–210 months of imprisonment for Counts 1 and 2.

The Defendant concedes that his drug quantity includes the 20 kilograms of cocaine that he attempted to acquire from the CS. However, he argues that his drug quantity does not rise above 50 kilograms because (1) his convicted drug offenses are unrelated to any other illicit drug activity involving the Defendant; and (2) his convicted drug offenses are insufficiently connected to the $890,210 of seized currency. Alternatively, the Defendant argues that, even if the $890,210 of seized currency is sufficiently connected to his convicted drug offenses, $26,000 per kilogram is an improper basis for conversion. The Court will address the Defendant's arguments below.

1.      **Defendant's Cocaine Distribution Scheme**

First, the Defendant's argument that his cocaine distribution scheme was limited to the 20-kilogram transaction with the CS is wholly contradicted by the record. Specifically, the record contains reliable evidence that just prior to engaging in his convicted offenses, the Defendant acquired at least 90 kilograms of cocaine through his brokers, "Primo" and "Tony"—the same individuals who acted as brokers for the 20-kilogram transaction. According to the testimony of the CS, at the meeting on November 29, 2011, the Defendant stated that he had purchased "over 90 kilos of coke" through a supplier that Tony introduced him to, but that the quantity and quality of the cocaine was deficient, and therefore, the Defendant was looking for another supplier. (Trial Tr. 189, Aug. 13, 2014, ECF No. 81.) The CS's testimony is corroborated by Schneider's pre-trial testimony. (Hr'g Tr. 118, Sept. 19, 2012) ("[Schneider: According to the CS, the Defendant said he] brokered prior deals through [Primo and Tony] and that [the Defendant] had purchased possibly up to 90 kilograms at a price of approximately

$27,000 and that the quality of those kilograms [of] cocaine turned out to not always be good,

and that he was looking for another supplier.") And as the Government notes, even though the

Defendant appeared to express leeriness toward the brokers at one point—namely, Primo, for

talking too much about the transaction—the Defendant's statements to the CS demonstrate his

ongoing business relationship with the brokers. *See, e.g.*, Gov. Ex. 13 (the Defendant states that

he wants to "give [the brokers] the opportunity to . . . make a little."); *see also* Hr'g Tr. 13, Oct.

5, 2012 (Schneider testified that the Defendant's statements indicated that both Primo and Tony

were continuously involved in the 20-kilogram transaction).[6]

Moreover, the existence of an ongoing cocaine distribution scheme is corroborated by the

Defendant's own recorded statements. At the meeting on November 29, 2011, the Defendant

stated that "I've been doing this for like 26 years [and I've] never been to prison," and that

"people fear me, because I've been here forever." (Gov. Ex. 2.). The Defendant also stated that

"people used to just give me a hundred [kilograms of cocaine] and they'd be like, 'Go,'" (*Id.*).

The recorded portion of the November 29 meeting also indicated that the Defendant and the CS

were contemplating a continuous—and potentially long-term—business relationship, as the CS

informed the Defendant that his supplier could produce "20 packages weekly" with no "dry

season." (*Id.*) According to Schneider, this statement suggests that the CS and the Defendant

were discussing the formation of an exclusive buyer-seller relationship. (Trial Tr. 65, 78, Aug.

15, 2014.) The Defendant also warned the CS that "I will continue to work with who I've been

_____

[6]In his Reply Brief, the Defendant argues that the evidence of a cocaine distribution scheme
between the Defendant and his brokers "comes exclusively from the testimony of the informant and is not
documented in the audio-recording of the [November 29] meeting." (Reply Br. 3.) Even if true, the Court
may permissibly base its factual finding on the testimony of a single witness—even a witness who is
arguably biased against the Defendant—so long as the testimony is reliable. *United States v. Mumford*, 25
F.3d 461, 467 (7th Cir. 1994).

working with" if the CS fails to offer a satisfactory price for the cocaine. (Gov't Ex. 2.; Hr'g Tr. 122–23, Sept. 19, 2012.) And at one point, the Defendant told the CS that he is interested in purchasing a "trap vehicle" (i.e., a vehicle with a secret compartment to conceal drugs) (Trial Tr. 192–93, Aug. 13, 2014, ECF No. 181), creating yet another inference that the 20-kilogram transaction with the CS is not an isolated incident, as the Defendant argues.

In light of the evidence above—including the testimony of Schneider and the CS, along with the Defendant's own recorded statements—the Court finds that the Defendant's purchase of at least 90 kilograms of cocaine is sufficiently connected to the 20-kilogram transaction with the CS, so as to "warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Purham*, 754 F.3d at 414. Based on this finding alone, the Defendant is responsible for a drug quantity between 50 and 150 kilograms.


**2.      Conversion of Seized Assets**

Alternatively, a drug quantity between 50 and 150 kilograms is also supported by the PSR's conversion of the $890,210 in currency seized from the Defendant's vehicles and bank accounts. According to the PSR, based on a conversion rate of $26,000 per kilogram, the seized currency equates to a drug quantity of 34.2 kilograms, which, combined with the 20 kilograms from the convicted drug offenses, results in a total of 54.2 kilograms.

When determining the quantity of drugs as relevant conduct, the Court may convert seized currency into an equivalent amount of the charged drug as long as the government proves a sufficient connection between the money seized and the drug-related activity by a preponderance of the evidence. *Rivera*, 6 F.3d at 446; *see also United States v. Patel*, 131 F.3d

1195, 1203–04 (7th Cir. 1997) ("a defendant is not automatically responsible under the relevant conduct guideline for all drug transactions revealed by the record, but only for those that are 'part either of the same course of conduct as the charged offense or of a common scheme or plan including the charged offense.'") (citing *United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996)). Further, the conversion rate must be "based on reliable evidence of the drug's price at the relevant time." *Patel*, 131 F.3d at 1203.

The Defendant challenges the conversion rate of $26,000 per kilogram, along with the connection between the seized currency and his convicted drug offenses.

a. *Conversion Rate*

As a preliminary matter, the Court agrees with the Defendant that a conversion rate of $26,000 per kilogram is improper. Specifically, the Defendant argues that the proper conversion rate is the price at which the Defendant was selling—and not buying—each kilogram of cocaine during the relevant time period.

At the post-trial hearing, Schneider testified that in 2011 the typical price range for a kilogram of cocaine is "$25,000 to about $30,000." (Hr'g Tr. 8, Oct. 1, 2015.) Schneider explained that, generally, the price per kilogram is contingent on the volume of the drug transaction. For example, a transaction for a single kilogram will typically result in a price per kilogram of $30,000; while a transaction for multiple kilograms (5 to 10 kilograms) will typically result in a price per kilogram of $27,000 to $28,000, but "probably closer to 27." (*Id.* at 9.)

As previously discussed above, the record shows that the Defendant was a multi-

kilogram purchaser of cocaine. At the November 29 meeting, the Defendant informed the CS that he had purchased 90 kilograms from another supplier for roughly $27,000 per kilogram. And at trial, Joseph Freeman—a fellow inmate of the Defendant's—testified that that the Defendant said he only dealt with people with at least $100,000. According to Schneider, due to the potential risks of robbery, multi-kilogram purchasers have an incentive to sell their product quickly, which in essence, limits their ability to substantially "mark-up" their prices on re-sale. (*Id.* at 17.)

In light of Schneider's testimony, coupled with reliable evidence that the Defendant is a multi-kilogram purchaser of cocaine, the Court finds that $28,000 per kilogram is a conservative estimate of the price in which the Defendant was selling his cocaine during the relevant time period.

b.      **Connection Between Currency and Cocaine Distribution Scheme**

Secondly, the Court has little difficulty finding that the $890,210 of the seized currency (i.e., $353,443 from the Defendant's Cadillac Escalade; $315,221 from the Defendant's Oldsmobile Starfire; and $221,546 from the Defendant's bank accounts) is sufficiently connected to the Defendant's cocaine distribution scheme.[7]

Notably, aside from the income deriving from the Defendant's distribution of cocaine, the record contains no evidence of any other source of substantial income. Although the PSR indicates that the Defendant is the owner of an entertainment company and a beauty salon,

---

[7]The Court notes that at trial, the jury determined that the $353,443 and $315,221 in seized currency was subject to forfeiture because "the property constituted or was derived from the proceeds obtained" as a result of the Defendant's convicted drug offenses [ECF No. 133]. The jury made no determination as to the $221,546 from the Defendant's bank accounts.

documents seized from the Defendant's home show that the Defendant was only earning $25,000 to $30,000 per year, or less, in 2008 and 2009. (Gov. Exs. 18a, 48, 53.) In fact, at the post-trial evidentiary hearing, Schneider said he believed the Defendant's businesses were used to launder and conceal drug money. (Hr'g Tr. 25, Oct. 1, 2015 ("[Defense Attorney:] Was [your answer that the Defendant's businesses were illegitimate] . . . based on your belief that those businesses existed solely for the purpose of laundering money from drug activity? [Schneider:] I believe that was a reason for them, or at least a portion of those businesses were for that, yes.)). The Defendant appeared to admit as much during his November 29 meeting with the CS. (Trial Tr. 194, Aug. 13, 2014, ECF No. 181 ("[Government Attorney:] Did [the Defendant] ever talk about how he might hide his drug business through any of [his businesses], if you recall? [CS:] He mentioned that he had some landscaping business, and stuff like that.")).

Furthermore, at the post-trial hearing, Schneider testified to his belief that the $668,664 "more than likely" represented drug proceeds. (Hr'g Tr. 19, Oct. 1, 2015.) This determination was based, in part, on the large denominations of the bills. Schneider's opinion is further supported by the locations in which the $668,664 was seized. The $353,443 was located at the scene of the arrest, and the $315,221 was located at the Defendant's residence, along with other evidence of drug activity (i.e., $6,059 in cash, two handguns, ammunition, a stun gun, a digital scale, a bullet proof vest, and a money counter). *See United States v. Jackson*, 3 F.3d 506, 511 (1st Cir. 1993) ("When drug traffickers possess large amounts of cash in ready proximity to their drug supply, a reasonable inference may be drawn that the money represents drug profits.").[8]

---

[8]The Defendant also raises the argument that a portion of the seized currency should be excluded because it was intended for the purchase of the 20 kilograms from the CS. However, there is no double-counting here because the seized currency—regardless of its intended use—represents proceeds from the Defendant's cocaine distribution scheme.

And even though the connection between the $221,546 seized from the Defendant's bank accounts and the Defendant's cocaine distribution scheme is less direct, the Court simply finds it implausible that such money derived from anything other than cocaine distribution. *Cf. United States v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009) (finding that the amount of money seized was not "so great that, given the defendant's financial circumstances, it could have derived only from selling [drugs].") (citing *United States v. Keszthelyi*, 308 F.3d 557, 577–78 (6th Cir. 2002).[9]

Thus, based on a conversion rate of $28,000, the seized currency equates to a drug quantity of 31.79 kilograms ($890,210/28,000), which, combined with the 20 kilograms from the convicted drug offenses, results in a drug quantity of 51.79 kilograms.

**B.      § 3553(a) Request for an Upward Variance**

In imposing a sentence, § 3553(a) requires a court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, and impose a sentence that is sufficient, but not greater than necessary, to satisfy the purposes of sentencing: adequately capturing the seriousness of the offense, providing just punishment, promoting respect for the law, affording adequate deterrence, protecting the public, and rehabilitating the defendant. In making this determination, a district court may not presume that the Guidelines sentence is the correct one. *Nelson*, 555 U.S. at 352; *Rita v. United States*, 551 U.S. 338, 351 (2007). Ultimately, a district court must make an independent determination, taking into account the types of sentences available, the other relevant § 3553(a) factors, and the arguments of the

---

[9]The Court notes that, based on a conversion rate of 28,000 per kilogram, the Defendant's drug quantity would still be 50 kilograms or more, even if $50,000 was excluded from the money seized in the Defendant's bank accounts.

parties. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). "[A] district court can vary categorically from every guideline, including the career offender guidelines." *United States v. Redmond*, 667 F.3d 863, 876 (7th Cir. 2012) (citing *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010)).

The Government argues that, given the nature and characteristics of the Defendant's offenses—in particular, his possession of automatic weapons with high-capacity magazines and his use of two houses to facilitate drug trafficking—a two-level upward variance is warranted. The PSR also notes that, pursuant to U.S.S.G. § 5K2.17, an upward departure may be warranted because the Defendant possessed a semiautomatic firearm capable of accepting a large capacity magazine in connection with his controlled substance offense.[10]

Upon review of each of the § 3553(a) factors the Court agrees that an upward variance of two-levels is necessary to satisfy the purposes of sentencing. First, the record shows that the nature and circumstances of the Defendant's offenses are extraordinarily dangerous. At the time of his arrest, the Defendant was carrying a loaded pistol and four additional magazines of ammunition (20 rounds per magazine). The ammunition contained pointed tips, a special ammunition designed to expand upon impact, thereby creating "a bigger wound area" for an intended target. (Trial Tr. 169, Aug. 14, 2014, ECF No. 182.) In addition to the loaded pistol, the arresting officers recovered an M-4 assault rifle, accompanied by four fully-loaded magazines (30 rounds per magazine) and a night vision scope. According to one of the arresting officers, the

---

[10]Because departures have been rendered obsolete, *see United States v. Dale*, 498 F.3d 604, 611 n.6 (7th Cir. 2007), the Court looks to § 5K2.17 only as guidance and in the context of the broad array of sentencing factors set forth in § 3553(a). And because the PSR only states that a departure under § 5K2.17 may be warranted, but does not alter the offense level on the basis of the Defendant's firearms, the PSR appropriately leaves the discretion on this matter to the Court.

assault rifle was located on the back seat of the vehicle, in an unzipped gun bag with the barrel exposed and pointing diagonally toward the front seats.

In his Reply brief, the Defendant argues that "there was no evidence that [he] either used, threatened to use, or attempted to use any such firearm." (Reply Br. 4.) But as the Government correctly notes, the location and apparent access of both the loaded pistol and the M-4 assault rifle suggest that the Defendant was both prepared and willing to use violence as a means to protect his cash and/or cocaine. Moreover, the Defendant does not dispute that the dangerous nature and circumstances of the Defendant's arrest were further escalated when the Defendant made an apparent attempt—albeit brief—to flee the scene after emerging from the car wash and being met with uniformed DEA and FWPD officers with weapons drawn, flashing police lights, marked and unmarked police cars blocking his exit, and verbal commands that he stop and get out of the vehicle.

While the above facts are sufficient to justify an upward variance, the Court also finds that aggravating factors are present in the Defendant's use of two houses to facilitate drug trafficking. Pursuant to Guideline § 2D1.1(b)(12), the offense level is increased by two levels if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Application Note 17 to § 2D1.1 provides that the enhancement "applies to a defendant who knowingly maintains a premises . . . for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." Additionally, "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or

collateral uses for the premises." *Id.*

Here, following the Defendant's arrest, officers conducted a valid search of his home, in which they located several items related to drug activity, including $6,059 in cash, two handguns, ammunition, a stun gun, a digital scale, a bullet proof vest, a money counter. *See United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012) (holding that enhancement applies when a defendant uses the premises for the purpose of substantial drug trafficking activities even if the premises is also the family home. But more notably, the Defendant maintained a second, sparsely furnished house, which also included a garage. According to Schneider, he believes the home was used primarily for the Defendant's drug activities, and that it represented the location where the Defendant intended to consummate the 20-kilogram transaction with the CS.

Accordingly, in consideration of the § 3553(a) factors—including the nature and circumstances of the Defendant's offenses and the history and characteristics of the Defendant—the Court determines that a two-level upward variance is warranted here, and that a guideline range of 210 to 262 months of imprisonment is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. This determination is based on the evidence in the record thus far. The Court has not yet heard from the Defendant, and he may wish to make a statement on his own behalf in mitigation of punishment. Indeed, he is entitled to make such a statement, as is the Government. *See* Fed. R. Crim. P. 32(i)(4)(A)(ii)-(iii). Therefore, the Court reserves a determination of the appropriate sentence until after the Defendant and the Government have had an opportunity to address the Court.

## CONCLUSION

For the foregoing reasons, the Court OVERRULES the Defendant's objection to the base offense level of 34, as calculated in the PSR, for an offense involving 50 to 150 kilograms of marijuana. The Court also GRANTS the Government's request for an upward variance from the advisory guideline range. The sentencing hearing scheduled for November 9, 2015, at 11:00 AM, is CONFIRMED.

SO ORDERED on October 30, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT