UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CAUSE NO.: 1:11-CR-78-TLS |
| SHAFT JONES | |

**OPINION AND ORDER**

This matter is before the Court on Defendant Shaft Jones' Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [ECF No. 237], filed on July 23, 2018. The Defendant seeks to have his conviction and sentence vacated based on claims of ineffective assistance of counsel. For the reasons set forth below, the Court DENIES the motion.

**BACKGROUND**

In November and December 2011, a series of negotiations and drug transactions occurred between the Defendant, a confidential source (CS) for the DEA, and three brokers. Oct. 30, 2015 Op. & Order 3–5, ECF No. 200. It started on November 14, 2011, when three brokers initiated a meeting with the CS to discuss connecting him with interested buyers, including one nicknamed "Superman." *Id.* at 4–5. On November 27, the brokers met with the CS again and specifically discussed supplying cocaine to Superman, who they claimed had around $300,000 to purchase drugs. *Id.* at 5. At the meeting, the CS and the brokers agreed that the CS would supply 20 kilograms of cocaine at $25,000 per kilogram, the brokers would supply the cocaine to Superman, and Superman would pay for 15 kilograms of cocaine and be fronted the remaining 5 kilograms. *Id.* They also scheduled a meeting between the CS and Superman to occur on

November 29 at an IHOP restaurant in Fort Wayne. *Id.* DEA agents were later able to identify Superman as the Defendant. *Id.*

On November 29, the Defendant, the CS, and two of the brokers, Ignacio Pizano-Guzman ("Primo" or "Cousin") and Luis Serrato-Diaz ("Tony"), met at the IHOP. *Id.* DEA agents had outfitted the CS with a recording device, but the batteries in the device died at one point during the meeting. *Id.* Thus, the discussion that occurred during the meeting was determined through the recordings as well as the CS's testimony.

At the meeting, the parties discussed a cocaine transaction using words like "eggs" and "omelettes" as code for kilograms of cocaine. *Id.* The Defendant stated that he purchased up to 90 kilograms from a different supplier and that he was currently paying $27,000 per kilogram. *Id.* at 6. However, the Defendant was not satisfied with the current supply's quality, so he was looking for a new supplier. *Id.* He told the CS that he would only be interested in a new supplier if the price was $1,000 per kilogram less than what he was currently paying. *Id.* Moreover, the Defendant told the CS, "I've been doing this for like 26 years, so I've been through—never been to prison." *Id.* He also said that "people used to just give [him] a hundred of them and they'd be like 'Go,'" which DEA agent Schneider—who was also an expert witness on drug trafficking— interpreted to mean that the Defendant was used to being fronted kilograms of cocaine. *Id.* at 6, 6 n.4. The Defendant told the CS that he had shown the brokers $300,000 in cash, which could be used for a drug deal. *Id.* at 6. The CS responded that his organization could supply cocaine on a weekly basis without a "dry season," meaning there would be no gap in supply. *Id.* Ultimately, the parties negotiated a transaction where the Defendant would purchase 15 kilograms of cocaine at $26,000 per kilogram and would be fronted an additional 5 kilograms. *Id.* at 6–7. The CS said that he would obtain the cocaine and tell them when the supply was ready. *Id.* at 7.

Later that day, the Defendant called the CS to tell him that he had the money ready for the transaction, but the CS told the Defendant that the shipment was not ready. *Id.* The two then discussed the possibility of shipping the cocaine in a "trap car" in order to conceal the drugs. *Id.* Although the CS was unable to record this call, DEA agents confirmed that it occurred. *Id.*

On December 3, the CS and the Defendant communicated back and forth on the phone. *Id.* The Defendant texted the CS saying, "[J]ust checking to make sure if we still good." *Id.* Then, he texted the CS raising concerns about the brokers due to someone telling him to stay away from them. *Id.* The CS responded that the shipment was ready but not in Fort Wayne yet, and that the deal could go on with or without the brokers. *Id.* Finally, in a recorded phone call between the Defendant and the CS, the Defendant reiterated his concerns about reports that one of the brokers had been talking about the transaction. *Id.* The Defendant still wanted to pay the brokers but mentioned potentially paying them off so the Defendant and the CS could do the transaction directly. *Id.* The CS told the Defendant that he would call him when the shipment arrived in Fort Wayne. *Id.*

On December 5, the CS made a recorded phone call to the Defendant to tell him that the shipment had arrived. *Id.* at 8. The parties agreed to meet at another restaurant in Fort Wayne the next day. *Id.* However, the Defendant did not show up for that meeting but explained in a text message that he was not able to get to the meeting on time and that he had lost his phone. *Id.*

On December 7, the Defendant told the CS on the phone that he was not able to contact the CS the day before. *Id.* The CS told the Defendant that he had returned the shipment of cocaine and that it had sold for more than $26,000 per kilogram. *Id.* He also told the Defendant that he would get more cocaine, to which the Defendant replied that he was ready to make the deal. *Id.* In a recorded call later that day, the Defendant told the CS that he was "going to wait,

3

because . . . I got about—about maybe like 21 points left." *Id.* Schneider thought this meant the Defendant was still getting his money together for the deal. *Id.* The Defendant stated in another recorded call that he would let the brokers "do the 5," and that he wanted them to have "the opportunity to make a little." *Id.* Schneider believed the Defendant wanted the brokers to be fronted 5 kilograms of cocaine and that they would be entitled to some additional money. *Id.* The CS and the Defendant also discussed the possibility of unloading the cocaine in a garage, and the CS agreed to go to the Defendant's garage to complete the deal. *Id.* at 8–9.

The CS and the Defendant met at a restaurant in Fort Wayne around 5:30 PM on December 7. *Id.* at 9. The Defendant arrived in a Cadillac Escalade and circled the restaurant in his car. *Id.* The CS told the Defendant that he needed to see the purchase money, so the Defendant suggested that they meet near the Glenbrook Mall. *Id.* As the Defendant was driving toward the mall, he suddenly braked and made a quick right-hand turn without signaling. *Id.* Schneider believed that the Defendant was making a counter-surveillance maneuver to determine whether undercover officers or anyone else was following him. *Id.* The Defendant then drove to a car wash in the mall's parking lot and the CS met him there. *Id.* The Defendant opened the door to his truck and showed the CS at least 20 bundles of money. *Id.* They discussed how the CS had a trap car that was supposedly on the way, and the Defendant wanted the CS to follow him in the trap car to another location. *Id.*

While waiting for the trap car to arrive, the Defendant drove his car into the car wash. *Id.* At that time, the CS told DEA agents that he had seen the money, so Schneider ordered officers to arrest the Defendant. *Id.* As the Defendant pulled out of the car wash, his exit was blocked by DEA and Fort Wayne Police Department (FWPD) officers and their vehicles. *Id.* at 9–10. The officers had their weapons drawn and ordered the Defendant out of the car. *Id.* at 10. The

4

Defendant drove his car sharply to the right and struck the car wash building in an apparent attempt to flee. *Id.* He exited from his car and was arrested by FWPD detective Hartup. *Id.*

Detective Hartup searched the Defendant and found a loaded pistol on his waistband and additional magazines in his pocket. *Id.* The search of the Defendant's car revealed $353,443 in cash, an M-4 assault rifle, four loaded 30-round magazines, and a night vision scope. *Id.* Officers also searched the Defendant's home where they discovered another car registered to the Defendant containing $315,221 of cash in the trunk. *Id.* In their search of the Defendant's house, officers recovered $6,059 in cash, two handguns, ammunition, a stun gun, a digital scale, a bullet proof vest, and a money counter. *Id.* Furthermore, officers determined that the Defendant had multiple accounts with Wells Fargo, so they seized an additional $221,546 from those accounts pursuant to a search warrant. *Id.*

The Government filed the Indictment [ECF No. 13] on December 22, 2011, charging the Defendant with three counts: (1) conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; (2) attempting to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846; and (3) carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Indictment, ECF No. 13. On June 6, 2012, the Defendant filed a Motion to Suppress [ECF No. 24] that sought to suppress all evidence recovered during the Defendant's arrest and the subsequent search of his home, arguing that the government lacked probable cause. The Court denied the Motion, concluding that the officers had probable cause based on, among other things, the negotiations between all the parties, the Defendant's evasive driving, and the Defendant showing money to the CS. Feb. 25, 2013 Op. & Order 16–17, 23–24, ECF No. 54.

The Defendant proceeded to a jury trial, which began on August 12, 2014. *See* ECF Nos. 115–16, 124, 126, 134. After four days, the jury found the Defendant guilty on all three counts. *See* ECF Nos. 126, 130. On August 18, 2014, the jury returned a verdict for forfeiture against the Defendant, and the Court denied his Rule 29 motion for a directed verdict. *See* ECF Nos. 133–134. On November 9, 2015, the Court sentenced the Defendant to 270 months' imprisonment, which consisted of concurrent 210-month terms on Count 1 and Count 2, and a consecutive 60-month term on Count 3. ECF Nos. 204–05. The Defendant filed a direct appeal arguing that there was insufficient evidence to support his conviction, that evidence should have been excluded, that certain recordings were unreliable, and that his sentence was too long. *See United States v. Jones*, 843 F.3d 321, 323–25 (7th Cir. 2016). The Seventh Circuit rejected each argument and affirmed the Defendant's conviction and sentence. *Id.*

On July 23, 2018, the Defendant filed the instant Motion pursuant to § 2255 [ECF No. 237]. The Defendant argues that his conviction and sentence should be vacated based on seven grounds for relief related to ineffective assistance of counsel by his pretrial, trial, and appellate counsel. Mot. 4–10, ECF No. 237; *see also* Mem. & Br., ECF No. 240. He also requests an evidentiary hearing. Mem. & Br. 1–2. The Government filed a response [ECF No. 241], and the Defendant filed a reply [ECF No. 244].

## ANALYSIS

Under 28 U.S.C. § 2255(a), a prisoner convicted of a federal crime may move the sentencing court to vacate, set aside, or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Motions to

vacate a conviction or sentence ask the district court to grant an extraordinary remedy to one who already has had an opportunity for full process." *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006). Generally, § 2255 petitioners "may not raise any issue that they might have presented on direct appeal." *Cross v. United States*, 892 F.3d 288, 294 (7th Cir. 2018) (citing *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016)). However, an exception to this procedural bar is that ineffective assistance of counsel claims may always be raised under § 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *see Ramirez v. United States*, 799 F.3d 845, 852–53 (7th Cir. 2015).

The Defendant's § 2255 Motion presents seven grounds for relief alleging ineffective assistance of counsel. A defendant claiming ineffective assistance must show that his "'counsel's performance was deficient' and 'the deficient performance prejudiced the defense.'" *Bridges v. United States*, 991 F.3d 793, 803 (7th Cir. 2021) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). This requires the defendant to show "(1) that his trial attorney's performance fell below an objective standard of reasonableness, and (2) that he suffered prejudice as a result." *Edmond v. United States*, 899 F.3d 446, 452 (7th Cir. 2018) (citing *Strickland*, 466 U.S. at 687–96). To show that an attorney's performance fell below an objective standard of reasonableness, the defendant must identify "specific acts or omissions by his counsel" that form the basis of his ineffective-assistance claim. *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (citing *Wyatt v. United States*, 574 F.3d 455, 457 (7th Cir. 2009)). Further, a defendant attempting to establish that he has been prejudiced "must show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bridges*, 991 F.3d at 808 (quoting *Strickland*, 466 U.S. at 694). Indeed, "[b]ald allegations of prejudice are insufficient to demonstrate ineffective assistance of counsel." *United States v.*

*Redd*, No. 1:03-CR-53, 2007 WL 1724900, at *8 (N.D. Ind. June 11, 2007) (citing *Barkauskas v. Lane*, 946 F.2d 1292, 1295 (7th Cir. 1991)). If a defendant cannot establish one of the *Strickland* prongs, the Court need not consider the other. *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014).

The Defendant's seven grounds for relief are as follows: ineffective assistance of counsel for failure to investigate the recordings (Ground One), ineffective assistance of counsel for failure to object to the non-testifying broker's statements (Ground Two), ineffective assistance of counsel for failure to subpoena witnesses (Ground Three), ineffective assistance of counsel for failure to raise prosecutorial misconduct related to evidence tampering and certain testimony (Ground Four), ineffective assistance of counsel for failure to investigate whether there was selective enforcement and prosecution (Ground Five), ineffective assistance of counsel for failure to argue that there was insufficient evidence as to the § 924(c) charge (Ground Six), and that the combined effect of these errors by counsel deprived him of a fair trial (Ground Seven).[1] The Court will address each ground in turn.

**1.     Ground One**

The Defendant claims that his counsel was ineffective for failing to conduct an adequate investigation of his case, particularly as to the recordings presented at trial. Mem. & Br. 4–7. He contends that his counsel's failure to obtain an analysis of the recordings undermined his ability to argue that they were inauthentic or that they should be admitted in their entirety under the doctrine of completeness. "The Supreme Court has held that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

---

[1] The Defendant referred to Ground 5 and Ground 6 in his Motion [ECF No. 237] as Ground 4(b) and Ground 5 in his Memorandum and Brief [ECF No. 240]. For clarity, the Court will identify the claims as they are named in the Motion.

unnecessary.'" *Anderson v. United States*, 981 F.3d 565, 575 (7th Cir. 2020) (quoting *Strickland*, 466 U.S. at 691). However, counsel was "not obligated to track down each and every possible witness or to personally investigate every conceivable lead." *United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002) (citing *Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir. 1987)). Thus, on a claim for ineffective assistance, "the petitioner has the burden of providing the court with specific information as to what the investigation would have produced." *United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) (citing *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003)).

Here, the Defendant has not provided specific information as to what further investigation would have revealed or how it would have affected his trial. He simply reasserts general allegations that the Government tampered with the recordings and that greater analysis would have shown the tampering. In fact, the record shows that counsel consulted with the Defendant's retained expert, Edward Primeau, and that Primeau had the opportunity to review the original recordings held by the Government. *See* Trial Tr. vol. 1, 142–43, 201–02, ECF No. 195; *see also* June 4, 2012 Letter, Ex. G, ECF No. 240. Ultimately, it appears that Primeau did not discover evidence of tampering. *See id.* at 142. Without more, the Court cannot conclude that the Defendant's counsel was unreasonable in his investigation of the recordings.

As for the Defendant's claims about the doctrine of completeness, it is unclear what an additional analysis would have changed. Under that doctrine, "a complete statement is required to be read or heard when 'it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" *United States v. Lewis*, 641 F.3d 773, 785 (7th Cir. 2011) (quoting *United States v. Sweiss*, 814 F.2d 1208, 1211–12 (7th Cir. 1987)). However, it does not require

9

portions of a statement to be admitted "that are neither explanatory of nor relevant to the admitted passages." *Id.* (quoting *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982)). Considering the attorneys were aware of what the entire recording showed, *see* Trial Tr. vol. 1, 209–17; Trial Tr. vol. 2, 309–10, ECF No. 189, it is unlikely additional investigation would have helped the Defendant present a better doctrine-of-completeness argument. Therefore, the Defendant cannot show ineffective assistance of counsel on this ground.[2]

**2.    Ground Two**

The Defendant argues that his counsel was ineffective for failing to object to statements attributed to non-testifying brokers and failing to investigate and locate these brokers. Mem. & Br. 8–17. To start, the Defendant misrepresents his counsel's efforts to exclude the broker's statements. His trial counsel repeatedly objected to their admission, *see, e.g.*, Trial Tr. vol. 1, 7–10, 189, and his appellate counsel argued the issue on appeal, *see Jones*, 843 F.3d at 324. The Seventh Circuit concluded that the statements were properly admitted under the co-conspirator exception to hearsay. *See id.* The Defendant also fails to describe what helpful evidence would have been recovered had his counsel made a greater effort to investigate and locate the brokers. *See Lathrop*, 634 F.3d at 939 (requiring petitioners to provide specific information as to what the investigation would have produced); *see also United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."). He gives no indication as to what the broker's testimony would have been and cannot otherwise show that counsel's

---

[2] The Defendant also claims that his appellate counsel was ineffective for failing to raise on appeal the deficiencies in the earlier counsel's performance. The Supreme Court has "criticized the practice of bringing [ineffective-assistance] claims on direct appeal, because 'the issue would be raised for the first time in a forum not best suited to assess those facts.'" *Ramirez*, 799 F.3d at 853 (quoting *Massaro*, 538 U.S. at 504). Thus, the Defendant's appellate counsel would not have been ineffective for failing to argue ineffective assistance on direct appeal as to this ground or any of the remaining grounds.

investigative efforts were unreasonable. The Defendant does not have a viable claim for ineffective assistance against counsel as it relates to the non-testifying brokers.

### 3. Ground Three

The Defendant argues that his counsel was ineffective for failing to call various witnesses for his defense, including Paul Peck, Richard Sharp, FWPD detective Kirby, the IHOP waitress, and Primeau. Mem. & Br. 17–23. "A lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review." *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997). Indeed, "[t]he Constitution does not oblige counsel to present each and every witness that is suggested to him." *United States v. Simpson*, 864 F.3d 830, 835 (7th Cir. 2017) (quoting *United States v. Berg*, 714 F.3d 490, 499 (7th Cir. 2013)). Thus, "[t]o assert a claim that counsel was ineffective for failing to call witnesses at trial, a defendant must make a 'specific, affirmative showing as to what the missing . . . testimony would have been.'" *United States v. Ray*, No. 3:14-CR-78, 2016 WL 8679078, at *1 (N.D. Ind. Dec. 28, 2016) (quoting *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991)); *see also Ashimi*, 932 F.2d at 650. The Defendant failed to make that showing here.

The Defendant provides no information about Peck and Sharp, their relevance to the case, or what their testimony would have been. Detective Kirby actually testified at trial and was cross-examined by the Defendant's counsel, *see* Trial Tr. vol. 3, 525–39, ECF No. 190, so it is unclear what additional testimony he could have provided in support of the Defendant's case. As for the IHOP waitress, the Defendant claims that she would have testified that the Defendant was talking about boxing—as opposed to drug trafficking—during the November 29 meeting. However, the Defendant did not submit an affidavit (or other information) from the waitress, suggesting that the Defendant's representations are nothing more than "self-serving speculation."

*Ashimi*, 932 F.2d at 650. Finally, the Defendant provides a bit more information about Primeau's expert testimony by attaching a letter Primeau sent prior to trial and an affidavit from August 2018. *See* June 4, 2012 Letter, Ex. G, ECF No. 240; Primeau Aff., Ex. AA, ECF No. 244. Primeau's letter states that, after reviewing the recordings and affidavit sent to him, he concludes the recordings do not support the affidavit. June 4, 2012 Letter, Ex. G. However, the letter is not clear as to what the recordings contained (and whether they were originals) or which affidavit was being reviewed. And as discussed above, the Defendant's counsel conferred with Primeau about his review of the original tapes and determined that Primeau did not find any issues with the recordings. *See* Trial Tr. vol. 1, 142–43. Based on that information, the decision to not call Primeau deserves deference and will not provide a basis for relief. *See United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (noting that, "[i]f counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic").

**4.     Ground Four**

The Defendant next asserts that his counsel was ineffective for failing to object based on prosecutorial misconduct related to tampering and misleading testimony given by Schneider. Mem. & Br. 23–28. Contrary to the Defendant's assertions, his counsel did object on the Defendant's behalf to argue that the recordings should be excluded due to tampering.[3] *See, e.g.*, Trial Tr. vol. 1, 142–43, 201–202. Furthermore, the Defendant's counsel attempted to undermine Schneider's testimony about the November 29 meeting through cross-examination, *see* Trial Tr. vol. 2, 308–10, 312–13; Trial Tr. vol. 4, 752–64, ECF No. 196, and he objected to certain questions soliciting Schneider's understanding of the conversation, *see* Trial Tr. vol. 2, 333–34,

---

[3] The Defendant's appellate counsel argued more specifically that the recordings should have been excluded for being unreliable based on a battery failure and an incorrect date. *See Jones*, 843 F.3d at 324–25. The Seventh Circuit disagreed and held that the recordings were properly admitted because the Government had established a chain of custody. *Id.*

337; Trial Tr. vol. 4, 737, 747–48, 749. Thus, the Court cannot say counsel's performance was deficient for the reasons the Defendant claims.

**5.     Ground Five**

The Defendant argues that his counsel was ineffective for failing to pursue whether the Defendant was targeted by enforcement and prosecution based on his race. Mem. & Br. 28–42. In order to assert a claim of either selective enforcement or selective prosecution, the Defendant must demonstrate that the prosecutor's or law enforcement's actions "had a discriminatory effect and were motivated by a discriminatory purpose." *Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001)). To show discriminatory effect, the Defendant needs to "demonstrate that a law or regulation was enforced against him, but not against similarly situated individuals of other races." *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Chavez*, 251 F.3d at 636; *United States v. Haynes*, 236 F.3d 891, 895 (7th Cir. 2001)). The Defendant also needs to show discriminatory purpose, which implies that the action was taken "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Conley*, 5 F.4th at 789 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)).

Here, the Defendant has not made a showing of selective enforcement or selective prosecution and, therefore, cannot establish prejudice for his ineffective-assistance claim. He claims that the DEA and FWPD are 95% white; states the racial demographics of Fort Wayne; and claims that reverse sting operations conducted in the Northern District of Indiana involve Black individuals 79.1% of the time, Hispanic individuals 9.9% of the time, and White individuals 12.0% of the time. Mem. & Br. 34, 36–37, 41. Not only has the Defendant not

provided the source of this information, but he fails to adequately connect these statistics to his case. There is no information about the types of crime, criminal histories, or other relevant factors that would allow the Court to determine if there is different treatment among similarly situated individuals. *See Barlow*, 310 F.3d at 1011 (explaining that "statistics must be relevant and reliable"). And while the Defendant points to the fact that he was prosecuted while the brokers were not, he is not similarly situated to the brokers. The Defendant—not the brokers—was present for the December 7 transaction, carried more than $300,000 in cash, and had various weapons and ammunition with him. *See* Oct. 30, 2015 Op. & Order 9–10. Given that the Defendant cannot show a similarly situated person being treated differently, he cannot show the prejudice necessary to support an ineffective-assistance claim.

**6.     Ground Six**

In this claim, the Defendant argues that his counsel was ineffective for failing to challenge whether there was sufficient evidence supporting his 18 U.S.C. § 924(c) charge. Mem. & Br. 42–47. He first argues that the predicate felony was created by the DEA and FWPD so he lacked the necessary intent to commit the crime. However, a sting operation does not automatically negate a § 924(c) charge and the Government had plenty of evidence supporting the conviction. *See, e.g.*, Oct. 30, 2015 Op. & Order 9–10; *see also Jones*, 843 F.3d at 323–24. Next, he seems to argue that he could not be convicted because the Government did not present evidence of predisposition or evidence that he previously carried a firearm in connection with a drug crime. This argument also fails because neither predisposition nor past evidence of carrying a firearm is an element of the crime. *See* 18 U.S.C. § 924(c)(1)(A) (punishing "any person who, during and in relation to any . . . drug trafficking crime . . . , uses or carries a firearm"). Construing his argument more broadly, the Defendant seems to be arguing that his counsel

should have presented an entrapment defense. Although his counsel did not raise that defense at trial, he clearly considered the option before deciding against it. Trial Tr. vol. 2, 426–27. This was a strategic decision that is given greater leeway when assessed on a claim of ineffective assistance. *See Lathrop*, 634 F.3d at 937 (stating that "[t]rial tactics are a matter of professional judgment" and that courts will generally not second-guess those decisions). Thus, this ground does not warrant relief.

7. **Ground Seven**

The Defendant's final argument is that the combination of alleged errors by his counsel had a cumulative effect that deprived him of a fair trial. Mem. & Br. 47–52. As discussed above, the Defendant has failed to demonstrate that his counsel's performance was deficient or that he suffered any prejudice. His arguments are based either on general allegations (as opposed to specific information) or fail to raise an issue that might have changed the outcome of his case. Thus, even when considering the totality of the alleged conduct, the Court's analysis and conclusions regarding ineffective assistance of counsel are unchanged.

8. **Evidentiary Hearing**

The Court concludes that there is no need for an evidentiary hearing. "An evidentiary hearing on a § 2255 motion is required unless the record 'conclusively show[s] that the prisoner is entitled to no relief.'" *Harden v. United States*, 986 F.3d 701, 707 (7th Cir. 2021) (quoting 28 U.S.C. § 2255(b); citing *Kafo*, 467 F.3d at 1067). Thus, when a petitioner fails to support a § 2255 motion with "a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions," no hearing is required. *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002) (quoting *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir. 1996)). Having reviewed the Defendant's allegations, the

Court concludes that he has not put forth "facts supporting each ground" of relief requested, which if proven true, would entitle him to relief. Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings. Therefore, the Court denies the Defendant's § 2255 Motion without an evidentiary hearing.

### NO CERTIFICATE OF APPEALABILITY

The Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11 of the Rules Governing Section 2255 Proceedings. A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, 893 n.4 (1983)). The Court finds that the Defendant has failed to show that reasonable jurists could debate whether his Motion presents a viable ground for relief. Therefore, the Court will not issue the Defendant a certificate of appealability.

### CONCLUSION

For the reasons stated above, the Court DENIES the Defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [ECF No. 237]. Further, the Court DENIES a Certificate of Appealability.

SO ORDERED on September 29, 2021.

    s/ Theresa L. Springmann  
    JUDGE THERESA L. SPRINGMANN  
    UNITED STATES DISTRICT COURT